FILED
2015 Sep-10  AM 09:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **TODD POLLARD,** | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No. 2:12-CV-03948-MHH** |
| | } | |
| **DRUMMOND COMPANY, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This is an employment action.  Plaintiff Todd Pollard is a former employee of defendant Drummond Company, Inc.  Mr. Pollard worked as an underground coal miner at Drummond's Shoal Creek mine in Adger, Alabama.  After Mr. Pollard visited a doctor for treatment of an on-the-job injury to his little finger, Drummond learned that Mr. Pollard has chronic back pain for which he takes methadone.  Based on Mr. Pollard's methadone use, Drummond suspended Mr. Pollard.  Mr. Pollard challenged his suspension and underwent a fitness-for-duty examination.  Drummond ultimately terminated Mr. Pollard.  Mr. Pollard contends that Drummond suspended him, and ultimately terminated him, because of his disability; he asserts claims against Drummond for disability discrimination.

The parties explored Mr. Pollard's claim during months of discovery.  Drummond contends that none of the evidence developed in discovery creates a disputed issue of material fact that a jury must resolve.  Consequently, pursuant to

1

Federal Rule of Civil Procedure 56, Drummond asks the Court to enter judgment in its favor on all of Mr. Pollard's claims.  (Doc. 41).  For the reasons provided below, the Court grants in part and denies in part Drummond's motion for summary judgment.

### STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party.  *White v. Beltram Edge Tool Supply, Inc*., 789 F.3d 1188, 1191 (11th Cir. 2015).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

## PROCEDURAL AND FACTUAL BACKGROUND

Drummond operates one of the largest underground coal mines in the United States at Shoal Creek mine in Adger, Alabama.  (Doc. 42-26, ¶ 4).  Underground coal mining is a dangerous profession.  (Doc. 42-10, p. 28; Doc. 42-11, pp. 54-55; Doc. 42-26, ¶ 12).[1]  Shoal Creek uses a method known as longwall mining to harvest coal.  (Doc. 42-26).  In longwall mining, shear machines (also called "shearers") cut long slices of coal from the face of the coal wall.  (Doc. 42-26, ¶¶ 7-11; Doc. 42-1, pp. 104-06).  A shear machine essentially is a rotating drum covered with metal teeth.  *Id.*  Hydraulic jacks and roof supports (also called "shields") hold up the roof of the mine while the shearer harvests a layer of coal. When the shearer advances forward, the shields also move forward and allow the roof over the harvested area to collapse.  *Id.*  The shear machines deposit the harvested coal onto a conveyor (also called a "pan line").  *Id.*

Mine workers continuously move the shearer, shields, and conveyor system forward as the shearer advances across the face of the coal.  (Doc. 42-26, ¶ 10). Miners work in close proximity to each other and to the constantly moving heavy machinery.  (Doc. 42-26, ¶¶ 13-16). Consequently, mine workers must be very

---

[1] As part of the summary judgment evidence in this case, Drummond provided deposition travel transcripts.  In this opinion, citations to those deposition transcripts reference deposition page numbers rather than the CM/ECF page on which the deposition testimony appears.  For example, the citation (Doc. 42-10, p. 28) refers to page 28 of the deposition of Don Hendrickson.  Page 28 of Mr. Hendrickson's deposition appears on page 8 of CM/ECF Doc. 42-10.

attentive and persistently aware of their surroundings to carry out their tasks in the mine safely. (Doc. 42-1, pp. 123-24).

On August 27, 2004, Drummond hired Mr. Pollard to work in the company's underground mine. (Doc. 42-3). From 2009 until he left the company in 2012, Mr. Pollard worked in longwall utility. (Doc. 42-3). His job duties included moving the shields, operating the shearer, and operating heavy-duty vehicles to transport the shields and conveyors in the mine. (Doc. 42-1, pp. 83-86, 99-102, 109-10, 138-39; Doc. 42-28, p. 8).

Mr. Pollard's eight-year work history at Drummond is fairly unremarkable. Don Hendrickson, Drummond's General Manager of Operations for the Shoal Creek mine, once observed Mr. Pollard slumping or dozing off while at the controls of one of the mining machines. (Doc. 42-10, pp. 18-19, 24-25, 48). Mr. Hendrickson does not recall when the incident occurred. (Doc. 42-10, p. 18). He did not make a written record of the event because "[Mr. Pollard] said he had a rough night. I got [sic] a lot of guys that had rough nights." *Id.* Near the time of Mr. Pollard's fitness for duty evaluation, Mr. Hendrickson asked Mr. Pollard's supervisor about Mr. Pollard's work. The supervisor reported that Mr. Pollard was "slacking off" and had to be reminded to complete his job duties. (Doc. 42-10, pp. 24-26, 30-32, 36).

4

Mr. Pollard's attendance record declined somewhat over his eight-year tenure with Drummond. His overall absentee rate (including excused and unexcused absences) in 2004 was approximately 6%; in 2005, it was approximately 9%; in 2006, it was approximately 12.5%; in 2007, it was approximately 11%; in 2008, it was approximately 11%; in 2009, it was approximately 12.5%; and in 2010, prior to Mr. Pollard's suspension in November 2010, it was approximately 19%. (Doc. 42-28, pp. 17-28). Many of Mr. Pollard's absences in 2010 were related to his now-wife's medical treatments. (Doc. 42-2, pp. 325-26).

Between 2004 and 2012, Mr. Pollard suffered two minor job-related injuries. On December 15, 2009, Mr. Pollard chipped his tooth while he was at work. According to the Injury Report, while he "was hooking [a] chain tub on [a utility vehicle]—the chain he was getting to secure the tub to [the] scoop swung around and hit him in the mouth chipping [his] front tooth." (Doc. 42-3, p. 3). On October 27, 2010, Mr. Pollard injured his little finger while he and a co-worker were moving dollies in the mine. (Doc. 42-28, p. 31). The co-worker lost his grasp on the dolly that he was handling, and the dolly bumped into the dolly that Mr. Pollard was holding, smashing Mr. Pollard's little finger. (Doc. 42-1, p. 135-36).

Drummond sent Mr. Pollard to see Dr. Romeo so that Dr. Romeo could examine and treat Mr. Pollard's finger injury.  (Doc. 42-27, ¶ 10).  While taking Mr. Pollard's medical history, Dr. Romeo learned that Mr. Pollard was taking 10mg of methadone 6 times per day for back pain.  (Sealed Doc. Tab E-1, PX 16).  Mr. Pollard acknowledges that he began taking methadone in 2007 to manage back pain from an injury that he suffered in a 2007 car accident.  (Doc. 42-1, p. 202).  Dr. Romeo wrote in Mr. Pollard's medical records that this "dosage of methadone . . . raises a safety concern for working in a coal mine.  In addition concern is raised regarding the possible spinal pathology that would account for back pain requiring this level of narcotic use for control and the resultant potential inappropriateness of him performing heavy labor."  *Id.*

Dr. Romeo forwarded Mr. Pollard's treatment records to Drummond's Disability Management department.  (Doc. 42-29, ¶ 5).  On November 1, 2010, a member of that department sent a redacted copy of Dr. Romeo's October 27, 2010 records to Mike Clements, Drummond's Manager of Employee and Industrial Relations.  (Doc. 42-29, ¶ 6).  The redacted copy did not contain specific information regarding Mr. Pollard's back pain, his use of methadone, or his dosage of methadone. (Sealed Doc. Tab M-1).  On November 3, 2010, Mr. Clements informed Mr. Hendrickson that Dr. Romeo had raised safety concerns about Mr. Pollard.  (Doc. 42-26, ¶ 21).  Based on his review of Dr. Romeo's redacted records,

Mr. Hendrickson had Mr. Pollard return to see Dr. Romeo on November 4 for a fitness for duty examination.  (Doc. 42-26, ¶ 22).

To assess whether Mr. Pollard could continue working at the mine safely, Dr. Romeo asked Mr. Pollard to authorize the release of his medical records from his treating physicians.  (Tab E-1, PX 17).  Mr. Pollard refused on the advice of his union representative.  (Doc. 42-1, pp. 204-05).  Dr. Romeo's records from the fitness for duty examination indicate that Mr. Pollard "first stated he takes Methadone 10mg 6 [times per day], then stated he takes 5 [per day], then stated he doesn't take it every day.  He finally stated he takes 0-3 [per day]."  (Tab E-1, PX 17).  Dr. Romeo's review of the Alabama Prescription Drug Monitoring Program database revealed that Mr. Pollard had a prescription for 90 mg of methadone per day (270 pills per month).  (Tab E-1, PX 17).

Based on his examination of Mr. Pollard and his review of the prescription drug monitoring database, Dr. Romeo advised Drummond's Disability Management department that Mr. Pollard would "present a direct threat to him[self] or to others" if he continued to perform his job duties at Shoal Creek mine.  (Tab E-1, PX 17).  Disability Management personnel then spoke with Mr. Clements to apprise him of Dr. Romeo's recommendation.  Mr. Clements also received a redacted copy of Dr. Romeo's fitness for duty examination report.  (Doc. 42-29, ¶ 11; Tab M-1).  Mr. Clements provided this information to Mr.

7

Hendrickson, who in turn suspended Mr. Pollard from his job duties at Shoal Creek mine.  (Doc. 42-27, ¶¶ 16-17).

Mr. Pollard challenged Drummond's suspension decision.  Pursuant to his union's collective bargaining agreement with Drummond, Mr. Pollard and Drummond mutually agreed upon an independent physician, Dr. Beck, to evaluate Mr. Pollard and determine whether Mr. Pollard was fit for duty.  (Doc. 42-28, p. 33; Doc. 42-9, p. 17; Doc. 42-11, p. 68).

Mr. Pollard authorized the release of his medical records to Dr. Beck as part of Dr. Beck's review of Mr. Pollard's fitness for duty.  (Doc. 42-2, p. 255).  Dr. Beck conducted his fitness for duty examination on June 1, 2012 and wrote a report of his findings.  (Sealed Doc. Tab F-1).  Ultimately, Dr. Beck agreed with Dr. Romeo's assessment that Mr. Pollard was a direct threat to himself and to other workers in the underground mine.  (Tab F-1).  Dr. Beck based his opinion on several factors, including Mr. Pollard's history of back problems, related weakness in the left leg, the likelihood of Mr. Pollard suffering additional back deterioration should he continue his job duties at the mine, the requirement of a high dosage of methadone to manage Mr. Pollard's back pain, the possible effects of methadone on his ability to work, and the nature of his work environment and job duties.  (Tab F-1; Doc. 42-16, pp. 14-17, 21-23, 30-31, 56, 65).

Dr. Beck submitted his report to Drummond's Disability Management department on June 8, 2012. (Doc. 42-18). The department communicated Dr. Beck's agreement with Dr. Romeo's assessment to Mr. Clements, but did not reveal any medical information or records. (Doc. 42-27, ¶ 29). Mr. Clements then consulted with Mr. Hendrickson. (Doc. 42-27, ¶ 30). Mr. Hendrickson decided to terminate Mr. Pollard. In making his decision, Mr. Hendrickson considered a variety of factors including Dr. Romeo and Dr. Beck's recommendations, Mr. Pollard's on-the-job injury history, Mr. Pollard's recent attendance record, reports that Mr. Pollard was slacking off, and Mr. Hendrickson's observation of Mr. Pollard apparently dozing while at the controls of a piece of underground mine equipment. (Doc. 42-26, ¶ 28). Mr. Pollard received a letter notifying him of his suspension with intent to discharge on June 13, 2012. (Doc. 42-9, p. 18). Mr. Pollard's termination became effective on July 12, 2012. (Doc. 42-27, ¶ 34).

Mr. Pollard filed a charge of discrimination with the Equal Employment Opportunity Commission on April 22, 2011. In the charge, Mr. Pollard alleged that Drummond discriminated and retaliated against him because of his disability. (Doc. 42-9, p. 21). The EEOC charge does not mention Mr. Pollard's termination because Mr. Pollard filed the charge before Drummond terminated his job. Mr. Pollard did not amend or file a separate EEOC charge after Drummond discharged him in July 2012. (Doc. 42-9, p. 21; Doc. 42-2, p. 270).

Mr. Pollard filed this action on November 26, 2012.  He asserts claims for disability discrimination, retaliation, and improper medical inquiry under the ADA. (Doc. 1).  The parties conducted fact and expert discovery.  The parties' evidence includes records and opinions from Mr. Pollard's treating and examining physicians and opinions from medical experts who the parties retained for purposes of this action.  Drummond moved for summary judgment on all of Mr. Pollard's claims, and the parties' arguments and evidence are before the Court for consideration.  (Doc. 41).

## ANALYSIS

### I.    Scope of the EEOC Charge

Drummond asks the Court to dismiss Mr. Pollard's termination claim because it exceeds the scope of his EEOC charge.   (Doc. 43, pp. 23-27). Generally, a plaintiff may pursue only claims based on adverse employment actions that occur within the 180 days preceding the filing of an EEOC charge.  42 U.S.C. § 2000e-5(e)(1).  A plaintiff's lawsuit "is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of a charge of discrimination." *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989).  Although exhaustion of administrative remedies is a prerequisite to filing a lawsuit, the Eleventh Circuit has refused to demand literal compliance in all situations.  *Id.*

(recognizing that literal compliance does not always advance the purpose of the requirement, which is to promote informal settlements).

> As long as allegations in the judicial complaint and proof are "reasonably related" to charges in the administrative filing and "no material differences" between them exist, the court will entertain them. As we have noted . . . , "the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Judicial claims which serve to amplify, clarify, or more clearly focus earlier EEO complaints are appropriate. Allegations of new acts of discrimination, offered as the essential basis for the requested judicial review are not appropriate.

*Ray v. Freeman,* 626 F.2d 439, 443 (5th Cir.1980) (citation omitted) (quoting *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir.1970)).[2]

Drummond relies on *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), for the proposition that a "charge . . . shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred. . . . [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges." 536 U.S. at 109-10, 113. Drummond argues that *Morgan* precludes Mr. Pollard from pursuing any claim based upon his discharge because Mr. Pollard did not file an EEOC charge as to that discrete act.

---

[2] After the Fifth Circuit split and the Eleventh Circuit was established, the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down before the close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th. Cir. 1981).

The *Morgan* opinion addresses discrete discriminatory acts that occur more than 180 days *before* an employee files an EEOC charge, not acts occurring *after* the filing of an EEOC charge. Neither the Supreme Court nor the Eleventh Circuit has discussed whether an employee may include in a lawsuit against his employer events that occurred after the employee filed a timely EEOC charge.

The circuits that have addressed this issue are split. For example, the Tenth Circuit has extended the *Morgan* rationale to preclude claims arising out of discriminatory acts that occur after an employee files an EEOC charge. *Martinez v. Potter*, 347 F.3d 1208, 1210-11 (10th Cir. 2003). On the other hand, the Eighth and Sixth Circuits have rejected that approach. *Wedow v. City of Kansas City*, 442 F.3d 661, 673-74 (8th Cir. 2006); *Delisle v. Brimfield Township Police Dep't*, Fed. Appx. 247, 251-54 (6th Cir. 2004).

Without a clear answer from the Supreme Court or the Eleventh Circuit, district courts in this circuit have split as to whether the *Morgan* rationale should apply in cases where discrete discriminatory acts take place after an employee files an EEOC charge. *See Garcia v. Baptist Health S. Fla., Inc.*, No. 12-23765-CIV, 2013 WL 632963 (S.D. Fla. Feb. 20, 2013) (discussing the split among the district courts). For example, the Middle District of Florida dismissed a retaliation claim that was not part of an earlier filed EEOC charge for failure to exhaust administrative remedies, but the Northern District of Florida allowed an employee

to pursue a retaliation claim even though the employee's EEOC charge did not mention retaliation. *Compare Terhune v. Potter*, No. 8:08-CV-1218-T-23MAP, 2009 WL 2382281, at \*3-4 & n.1 (M.D. Fla. July 31, 2009), *with Sumrall v. Potter*, No. 4:03-CV-103-SPM, 2007 WL 1202722 (N.D. Fla. Apr. 22, 2007). As the Northern District of Florida noted in *Sumrall*, the law in the Eleventh Circuit currently provides that a related, after-occurring incident can be included within the scope of a timely filed EEOC charge. *Sumrall*, 2007 WL 1202722, at \*2 (citing *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 168-69 (11th Cir. 1988)).

Like the *Sumrall* Court, this Court will follow *Baker*. When a claim for termination, which occurred after the employee filed his EEOC charge, "could reasonably be expected to grow out of the original charge of discrimination," the district court has jurisdiction to hear the termination claim as well. *Baker*, 856 F.2d at 169. Mr. Pollard's termination claim is "like or related to" the allegations in his EEOC charge such that a reasonable investigation of the charge would encompass the termination claim. In his EEOC charge, Mr. Pollard claims that Drummond suspended him without pay on November 4, 2010 because of his disability and refusal to release his medical records to Drummond. (Doc. 42-9). His termination claim is virtually identical to his discrimination claim. In fact, the termination is merely the culmination of the process that began with Mr. Pollard's suspension without pay. Drummond terminated Mr. Pollard while Mr. Pollard's

EEOC investigation was pending and before the EEOC issued its right-to-sue letter on August 29, 2012.

Mr. Pollard's termination claim, therefore, is within the scope of his EEOC charge, he appropriately exhausted his administrative remedies, and all claims are now properly before this Court for consideration on the merits.  *See, e.g., Everitt v. Cent. Miss., Inc. Head Start Program*, 444 Fed. Appx. 38, 44 (5th Cir. 2011) (concluding that a termination claim was within the scope of an earlier filed EEOC charge asserting retaliation, because the allegations were related and the termination occurred during the EEOC investigation before the EEOC issued its right-to-sue letter); *Mesa v. Verizon Bus. Network Servs., Inc.*, No. 3:10-CV-2324-D, at *7 (N.D. Tex. Aug. 14, 2012) (same); *Bryan v. Prince George's Cnty., Md.*, No. DKC-10-2452, 2011 WL 2650759, at *4 (D. Md. July 5, 2011) (allowing the termination claim to go forward, though the plaintiff's suspension was the only adverse action alleged in the EEOC charge, because the termination was merely the culmination of the process that began with the plaintiff's suspension); *Jackson v. Lake Cnty.*, No. 01-C-6528, 2003 WL 22127743, at *15 n.15 (N.D. Ill. Sept. 15, 2003) (same).

## II.    Merits of the ADA Discrimination Claim

Drummond argues that Mr. Pollard's discrimination claim fails on the merits.  To prove a prima facie case of discrimination under the ADA, a plaintiff

must demonstrate that he is disabled, that he is a qualified individual, and that he was subject to unlawful discrimination because of his disability. *Hillburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999). Drummond argues that Mr. Pollard cannot establish the second and third elements and that the Court, therefore, should dismiss Mr. Pollard's claim. Drummond also argues that its reliance on two doctors' recommendations regarding Mr. Pollard's fitness for duty was reasonable.

Under the ADA, an individual is "qualified" if he, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Under the ADA, an employer cannot "discriminate against a qualified individual on the basis of disability" by "using qualification standards . . . that screen out or tend to screen out an individual with a disability." 42 U.S.C. § 12112(b)(6). "By that same definition . . . as well as by separate provision, § 12113(a), the [ADA] creates an affirmative defense for action under a qualification standard 'shown to be job-related for the position in question and . . . consistent with business necessity.'" *Chevron U.S.A. v. Echazabal*, 536 U.S. 73, 78 (2002) (quoting 42 U.S.C. § 12112(b)(6)). A qualification standard may include a requirement that an individual shall not pose a direct threat to the health and safety of himself or others in the workplace. *Id.*; 29 C.F.R. § 1630.15(b)(2). Though the Supreme Court in

15

*Chevron* described the "direct threat" defense as an affirmative defense, it did not

address which party bears the burden of proof.   In the Eleventh Circuit, "[t]he

employee retains at all times the burden of persuading the jury either that he was

not a direct threat or that reasonable accommodations were available."   *Moses v.*

*Am. Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996).[3]

Genuine issues of material fact exist as to whether Mr. Pollard posed a direct

threat to his health and safety or to the health and safety of other Drummond

employees working in Drummond's underground mine and whether Drummond's

reliance on two physician recommendations was sufficient.   Mr. Pollard began

taking methadone for back pain in 2007 following a car accident, and he used

methadone from 2007 until 2010 without incident.   (Doc. 42-1, p. 202).   Dr.

Romeo opined that this high dosage of methadone was inappropriate and a safety

concern for work in the mine.   (Doc. 42-14, pp. 53-56).   Dr. Romeo's opinion was

based, at least in part, on his experience with other methadone patients, his

knowledge of methadone's potential side effects, and his general belief that any

mine employee taking methadone should be placed on restriction.   (Doc. 42-14, pp.

---

[3] The circuits are split regarding the burden of proof on the question of whether an employee poses a direct threat under the ADA.   *See Branham v. Snow*, 392 F.3d 896, n.5 (7th Cir. 2004) (discussing the circuit split and suggesting "that the confusion stems from the language of the ADA itself, since the statute includes the direct threat language in a section entitled 'Defenses,' which suggests it is an affirmative defense on which the defendant bears the burden of proof, but also classifies the direct threat analysis as a 'qualification standard,' which suggests that the plaintiff bears the burden of proving that he or she does not constitute a direct threat.").

7, 15; Doc. 50-2).  Drummond's medical expert, Dr. Jerrold Leikin, testified that even a patient who has developed a tolerance for methadone over many years would still experience impairment such as slower brain function as a side effect. (Doc. 42-21, pp. 17, 37).  Dr. Scott Boswell, one of Mr. Pollard's treating physicians, saw things differently.  Dr. Boswell testified that a patient like Mr. Pollard, who had been taking methadone for a while and had become acclimated to the medication, would not be handicapped by it and could perform safety-sensitive job functions.  (Doc. 42-19, pp. 33-35, 38-39).

The defendant's "direct threat defense must be based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job."  *Chevron*, 536 U.S. at 86.  An employer may reasonably rely on medical evidence to make its employment decisions, but this reliance must "be reasonably based on particularized facts."  *Lowe v. Ala. Power Co.*, 244 F.3d 1305, 1308 (11th Cir. 2001).  An employer may not rely upon the recommendation of a physician who, like Dr. Romeo, conducts a cursory examination and bases his opinion at least in part on a general assumption that all patients with the same disability have the same limitations.  *Lowe*, 244 F.3d at 1309 (denying summary judgment where a physician recommended restrictions for a double amputee based on a cursory

17

examination of him and a general assumption that all double amputees have the same limitations).  Furthermore, an assessment based on the known possible side effects of a medication, as opposed to an individualized inquiry into a patient's present ability to perform his job functions, is insufficient. *Haynes v. City of Montgomery*, No. 2:06-CV-1093-WKW, 2008 WL 4495711, at *4-5 (M.D. Ala. Oct. 6, 2008).

In contrast to Dr. Romeo's assessment, Dr. Beck testified that Mr. Pollard's high dosage of methadone was not, in and of itself, a sufficient reason to disqualify Mr. Pollard from working in the mine.  (Doc. 42-16, p. 64).  Instead, Dr. Beck viewed the high dosage of methadone as an indicator for the level of back pain Mr. Pollard suffers.  In Dr. Beck's opinion, that level of pain, along with Mr. Pollard's back weakness and related leg problems, posed a threat both to Mr. Pollard and to others working in the mine.  (Doc. 42-16, p.17).  Dr. Romeo, however, testified that if Mr. Pollard could work through his back pain, he would not have a problem with that.  (Doc. 42-14, pp. 53-56).  In short, the two physicians' opinions and recommendations are in conflict.

Beyond the medical evidence in the record, Mr. Pollard presented evidence that he is qualified for the essential job tasks of longwall mining.  Perhaps most compellingly, the evidence demonstrates that Mr. Pollard had worked for Drummond in a variety of positions since 2004 with only minor infractions.

18

Drummond points to Mr. Pollard's increased absenteeism in 2010, his on-the-job injuries in December 2009 and October 2010, and the reports of him "slacking off" on the job at some undetermined point during his employment as evidence of methadone's impact on Mr. Pollard's ability to perform his essential job functions. Mr. Pollard's notice of suspension with intent to terminate did not list these items as reasons supporting Drummond's decision to terminate him. (Doc. 42-9).  And the parties dispute the extent to which these job issues can be attributed fairly to Mr. Pollard's back pain and methadone use.  If these were signs of methadone's side effects, the performance issues did not manifest themselves until Mr. Pollard had been on the medication for almost three years.

Mr. Pollard's situation is similar to the plaintiff's situation in *Rigby v. Springs Indus., Inc.*, No. 1:03-CV-0637-VEH, ECF No. 35 (N.D. Ala. May 5, 2006).  In that case, the plaintiff alleged that he was not retained because he took Lortab. Although the defendant presented evidence of the known side effects of Lortab, the plaintiff presented evidence that he did not display those side effects and had worked for approximately eight months without incident.  In *Rigby*, the Court concluded that the evidence constituted a factual dispute such that summary judgment in favor of the defendant was not appropriate.  For similar reasons, summary judgment is inappropriate here.

In sum, viewing the evidence in the light most favorable to Mr. Pollard, questions of fact remain as to whether he posed a direct threat to his safety or the safety of others and as to whether Drummond's decisions to suspend and ultimately terminate him were based on particularized facts using the best available objective medical evidence as required by the governing regulations. Resolving those questions will hinge on assessment of witness credibility and a weighing of the evidence, which are tasks for a jury, not a court. *Nevitt v. U.S. Steel Corp.*, 18 F. Supp. 3d 1322, 1334 (N.D. Ala. 2014). Summary judgment, therefore, is inappropriate as to Mr. Pollard's ADA discrimination claim.

## III.   Improper Medical Examination and Retaliation Claims

Drummond argues that Mr. Pollard's improper medical inquiry and retaliation claims fail as a matter of law. Mr. Pollard does not oppose the dismissal of those two claims. (Doc. 51, p. 4). Therefore, the Court grants Drummond's motion for summary judgment as to Mr. Pollard's improper medical inquiry and retaliation claims.

## CONCLUSION

For the reasons discussed in this opinion, the Court **GRANTS IN PART** and **DENIES IN PART** Drummond's motion for summary judgment. The Court **DISMISSES WITH PREJUDICE** Mr. Pollard's improper medical examination

and retaliation claims.  The Court will set Mr. Pollard's ADA discrimination claim for trial by separate order.[4]

   **DONE** and **ORDERED** this September 10, 2015.

         *Madeline H. Haikala*

         **MADELINE HUGHES HAIKALA**
         UNITED STATES DISTRICT JUDGE

---

[4] Drummond has filed a motion to exclude the expert testimony of Dr. Ali.  (Doc. 66).  The Court has not relied on the testimony of Dr. Ali in reaching a decision on Drummond's motion for summary judgment and therefore finds that the motion to exclude Dr. Ali's expert testimony is moot for present purposes.  Drummond may renew the motion to exclude Dr. Ali's expert testimony for purposes of trial if the company wishes to do so.